McCONNELL et al., Appellees,

v.

BUDGET INNS OF AMERICA et al., Appellants.

[Cite as *McConnell v. Budget Inns of Am.* (1998), 129 Ohio App.3d 615.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 72755.

Decided Aug. 31, 1998.

*David Goldense; Sebastian Fasanello* and *Richard Griffin, Phillips, Lytle, Hitchcock, Blaine & Huber,* for appellees.

*Judson J. Hawkins; Richard R. Kuepper* and *Kuepper, Walker, Hawkins & Chulick,* for appellants.

JAMES D. SWEENEY, Judge.

Defendants-appellants Brookpark Motor Lodge, Inc., d.b.a. Budget Inns of America ("Budget"), and G & L Management Company appeal from the jury verdict in the amount of $503,700 against both defendants jointly, in favor of plaintiffs-appellees Gerald McConnell ("McConnell") and Canada's Ontario Workmen's Compensation Board ("board"). For the reasons adduced below, we reverse and remand the matter.

A review of the voluminous record on appeal indicates that plaintiff registered as a guest at the Budget Inn located on Brookpark Road on March 31, 1992.

While in his room, plaintiff, a truck driver who was employed by an Ontario, Canada trucking company at the time of the accident, used a chair located in the private room assigned for his use. While plaintiff was seated in the chair at approximately 8:00 p.m., after approximately one hour of use, it collapsed without warning, causing injury to plaintiff's neck, back, and shoulders as he fell to the floor. Thereafter, McConnell returned to his home in Niagara Falls, Ontario, and filed a workmen's compensation claim with the board,[1] which board has subrogation rights to recover benefits paid to McConnell from any damage recovery received by McConnell. McConnell worked for approximately five months since the date of the accident until the time of trial.

On May 21, 1996, the plaintiffs, named individually, filed their complaint[2] against Budget and G & L Management Company, the operators of the motel, alleging a premises-liability negligence claim and a subrogation claim. The defendants duly answered, generally denying liability and raising a number of affirmative defenses. Subsequent to motion practice and discovery by the parties, the matter ultimately was heard by a jury commencing on June 3, 1997.

The plaintiffs offered a number of witnesses and evidence on their behalf. The first witness for the plaintiffs was Kevin Hastings, the motel's general manager at the time of the accident, who testified that the chair in question had been purchased in 1964, and the motel has a policy of inspecting the rooms and their furnishings on a regular basis. There was only one chair in the room at the time, a desk chair. Hastings also identified a series of photographs he had taken of the broken chair after the accident, and indicated that the left side stretcher, which connects the back leg assembly to the front leg assembly beneath the seat, was missing from the chair in question. There was no indication that McConnell had abused the chair, nor was there any record of the chair's having ever been repaired before the accident. Hastings first observed McConnell, who complained of being sore and was supporting his right arm in a sling, the morning after the accident, at which time Hastings prepared an incident report. The motel disposed of the broken chair some time after the accident and replaced it with a chair valued at seventy dollars.

---

1. McConnell's July 27, 1992 election to claim benefits under Part 1 of the Ontario Workmen's Compensation Act with respect to the accident involving the (third-party) motel specifically provided the following statement:

   "[M]y election to claim compensation under Part 1 of the said Act subrogates, transfers, to the Workers Compensation Board *any* right or *claim I may have against the said Third Party* in respect of the said accident ***." (Emphasis added.)

2. This filing was a refiling of the case. The case was originally filed on May 25, 1995, and was voluntarily dismissed by plaintiffs.

The second witness for the plaintiffs was Alfred Fierle, the 3:00 p.m. to 11:00 p.m. desk clerk at the motel at the time of the accident. Fierle testified that McConnell called the front desk at approximately 8:30 p.m., complaining of being injured and on the floor due to the chair collapsing, so Fierle notified 9–1–1 emergency personnel. McConnell was later taken, past Fierle at the front desk, to the hospital on a stretcher on the evening of the accident. The witness also telephoned Hastings at home that night and told him of the accident.

The third witness for the plaintiffs was Oscar Holloway, shuttle van driver employed at the motel at the time of the accident, who testified that he was sent to McConnell's room (room 221) by the front desk clerk, Fierle, after McConnell had telephoned the front desk complaining of having fallen and sustaining injuries. When he reached the room, McConnell opened the door and observed the broken desk chair, in pieces, between the desk and the bed. The witness waited in the room with McConnell, who was on the bed, until the ambulance arrived.

The fourth witness for the plaintiffs was Lucille McConnell, the spouse of the victim for approximately twenty years, who testified about her husband's work and medical history in addition to the injuries (both physical and psychological) suffered by her husband as a result of the accident herein and their effect on the family members and family activities.

The fifth witness for the plaintiffs was Miriam Flynn, a Canadian barrister and solicitor employed by the board as senior legal counsel. Flynn described the workmen's compensation procedure in Canada and detailed the amount of benefits the board had allocated on McConnell's behalf as a result of this accident, arriving at a total of $213,994.03 (Canadian).[3] A November 1993 nine-page medical evaluation of McConnell by Dr. Kliman (an orthopedic physician in Toronto, Canada) and a later evaluation in 1995, which were prompted by a referral by the witness, indicated that McConnell could tolerate light and/or sedentary employment. McConnell's employer made an offer of light duty with no loss of wages for McConnell in an April 30, 1993 letter to the board if it would help get McConnell back into the work force. In fact, the vocational rehabilitation section of the board may have advised McConnell to return to the work force.

The sixth witness for the plaintiffs was Robert Lychenko, a Canadian vocational rehabilitation specialist, who was employed by the board as an expert to offer an assessment of McConnell in mid–1995. It was this witness's opinion that McConnell had a slim chance of returning to the work force, except in low–level, part-time minimum-wage-type sedentary jobs that do not require much intelli-

---

3. The trial transcript provided by appellant does not contain pages 225 through 228.

gence or skill, such as school crossing guard, potato chip sorter, envelope machine tender, or canned goods inspector. The witness was aware of McConnell's employer's offer to provide him a light-duty job, but he was not aware that the offer secured his present rate of pay as a truck driver.

The seventh witness for the plaintiffs was John Siegel, a certified public accountant, who testified as an expert concerning economic loss evaluation. This witness calculated the future loss of income and benefits that McConnell has sustained should he never return to work at $499,600 (Canadian). The witness also stated that the conversion rate is seventy-three cents on the dollar when converting United States currency into Canadian currency.

The eighth witness for plaintiffs was McConnell, who generally corroborated the testimony of the other witnesses concerning the accident, his injuries (past and present), treatments, and finances. The witness stated that he had been to that hotel a couple of times in the past and as he was at the desk in his room filling out his log books for approximately one hour, the undercarriage of the chair broke, causing him to tip backwards. He struck his head on the bed which was behind him before striking the floor, ending up wedged between the bed and the desk with the upper part of the chair around him. The back of the chair had broken away from the body of the chair. He had no feeling in his back or legs and his right shoulder was in pain immediately after the accident. He did not notice anything wrong with the chair prior to using it. His recollection of the events after the fall was hazy. The day after the accident, at the request of his employer, the witness asked the hotel manager whether he could have the broken chair to take home. The hotel manager refused to release the chair. However, the witness's friend, Pyne, did take photographs of the broken chair, which photographs the witness identified in court as exhibits.

The ninth witness for the plaintiffs was Dr. Adrian Hanick, a board-certified psychiatrist, who evaluated McConnell at the request of the board, and who testified that the severe psychological problems McConnell was experiencing, rendering him totally and permanently disabled, were proximately caused by the injuries sustained in the accident and amplified and intensified the physical pain experienced by McConnell.

The tenth witness for plaintiffs was John Bock, a psychologist who evaluated McConnell at the request of the board regarding the potential for rehabilitation, who testified that it was his professional opinion that McConnell was not a malingerer and was suffering from chronic pain disorder as a result of the accident, which sharply limits his possibility of rehabilitation.

The eleventh witness for the plaintiffs was Melvin Scheer, the owner of Tradition House Woodworking (which is a woodworking shop in New York) from 1966 to 1992, where he constructed, manufactured, designed, and/or repaired

wooden furniture.   Scheer, as an expert on chair construction with a total of thirty-six years of experience in the woodworking trade beginning in 1956, testified that he inspected the photographs of the wood chair in question and indicated that it was constructed using dowels whose joints were secured by glue, with stretchers, or rungs, connecting the support legs.   The purpose of the stretchers is to transfer the load on the chair equally to all support legs and to strengthen the overall structural integrity of the chair.   The photographs additionally indicated that the left side stretcher was missing, and the wooden stub protruding from the front left chair leg (which stub is the remnant of the dowel end of that stretcher) indicates by the darkened color of the wood that the break in the dowel was not a recent event;   in other words, the stretcher had been missing for some time.   Also, the exposed dowels on the right side of the chair indicate that the glued joints were already weakened and loosened, and did not hold;   otherwise they would have held together or snapped during the collapse. The chair also was missing a secondary cross rung underneath the chair.   It was the witness's opinion that the chair's joints experienced glue failure in the animal-hide-based glue over time, the chair having been put in service in 1964.

The twelfth witness for the plaintiffs was Larry Hopkinson, the corporate secretary and administration manager of McConnell's employer, Hendrie Corporation, at the time of the accident.   This witness testified that the company maintains modified work duties for its injured workers in an effort to get them back to their normal duties, but such modified positions are not used indefinitely, and end, at most, after one year, when the injured worker is unable to return to his normal duties.   McConnell utilized a modified duty arrangement with the company for five months, from September 27, 1993 to February 4, 1994, but McConnell was unable to return to his original duties as a truck driver.   The witness also testified to the work record of McConnell and the number of days over the years that McConnell has missed from work due to various reasons.

At this point, the plaintiffs dealt with the admission of their exhibits.   The defendant then moved, without explanation or argument, for a directed verdict. The trial court, without explanation, denied the motion for directed verdict and recessed for the evening.

Resuming the trial the next morning, the plaintiffs offered their thirteenth witness, Dr. Michael Kliman, a board-certified orthopedic surgeon, who assessed McConnell at the request of the board on three occasions over a period of approximately five years from the date of the accident.   Dr. Kliman testified as to the injuries complained of by McConnell, McConnell's medical history, the medical evaluations conducted by the witness, and the observations and findings by the witness.   One of the observations of the witness was that McConnell was free of significant shoulder, neck, or back symptoms for five years prior to the

accident in question. The witness diagnosed McConnell as having sustained the following injuries: (1) to the lower back, soft tissue strain or hyperextension with nerve inflammation; (2) to the right shoulder, muscle strains with bursitis and capsulitis; (3) to the neck, soft tissue strain or hyperextension. The witness also opined that strains may not heal for very long periods of time, and each of the assessments showed consistent results, if not deterioration in some respects in subsequent assessments, with no evidence of malingering or exaggeration. It was the witness's opinion, at the time of each assessment, that McConnell could not have returned to being a truck driver, that the injuries complained of were directly and proximately caused by the accident in question, and that the symptoms are chronic and are permanent in nature. The witness also believed that some of the back problems might be alleviated if the overweight McConnell would lose some weight. The witness was not aware of McConnell's entire medical history, including that as recently as 1991, McConnell complained of back and shoulder pain.

At this point, the plaintiffs rested and the defense, without argument, renewed its motion for directed verdict. The trial court, without explanation, perfunctorily denied the renewed motion.

The defense then offered the testimony of three witnesses. The first witness was Fierle, who reiterated his previous testimony and added that McConnell sounded normal over the telephone when McConnell reported the accident to the front desk of the motel. Upon checking out of the motel on the afternoon following the accident, McConnell walked out of the motel without any help or indication of distress, other than having his arm in a sling.

The second defense witness was Hastings, who reiterated his previous testimony adding that he had never received any complaints concerning the chairs of the type used in the accident and owned by the motel. The witness also stated that if a room was occupied, the chair in that room would be inspected daily by the housekeeping staff as the room was cleaned. The witness also spoke with McConnell on the telephone on the morning after the accident and McConnell sounded fine. When the witness observed McConnell later on the day after the accident, McConnell walked normally with his right arm in a sling. By the time the lawsuit was filed, the witness had not reviewed the maintenance records, which had been discarded by that time.

The third defense witness, appearing by videotaped deposition, was Dr. Dennis Brooks. The record does not reflect that Dr. Brooks's videotaped deposition was filed with the court, either in videotape format or in transcript form.

At this point, the defense rested and then renewed its objection to having both plaintiffs as parties to the case. The defense argued that the only proper party plaintiff with standing was the board. Following closing arguments and the

charge to the jury, the jury returned its verdict.   This appeal followed and presents four assignments of error.

"I

■ "The trial court erred when it refused to follow the Restatement of Conflict of Laws. its refusal to follow Ohio Supreme Court case law and to apply Canadian law resulted in the defendant contesting two plaintiffs when only one had standing."

Ontario's Workmen's Compensation Act, at Part 1, Section 10, provides the following :

"(1) Where an accident arising out of and in the course of a worker's employment happens to the worker under such circumstances as entitle the worker or his or her dependants to an action against some person other than the employer, or an executive officer or director thereof, the worker or his or her dependants, if entitled to benefits under this Part, *may claim such benefits or may bring such action.*

"* * *

"(4) If the worker or his or her dependants elect to claim benefits under this Act, the employer, if the employer is individually liable to pay it, and *the Board,* if the compensation is payable out of the accident fund, are *subrogated to all rights of the worker* or his or her dependants in respect of the injury to the worker *and may maintain an action in the name of the worker,* or of the Board if the employer is in Schedule 1, or of the employer if the employer is in Schedule 2, against the person against whom the action lies and *any amount recovered over and above all amounts expended by the Board* or the employer in respect of such claim and action *shall be paid to the worker* or his or her dependants and any such surplus paid to the worker or his or her dependants shall be deducted from the amount of any future compensation or other benefits to which the worker or his or her dependants may become entitled in respect of the accident that gave rise to the injury."   (Emphasis added.)

In summary, Ontario's workmen's compensation plan permits an injured worker to elect either to claim benefits from the accident fund or commence an action against the tortfeasor, but that worker may not do both.   This view was most recently expressed in *McRae v. Canada (Attorney General)* (British Columbia App. 1997), 99 B.C.A.C. 112, 162 W.A.C. 112, 1997 B.C.A.C. LEXIS 2068, wherein the appellate court cited with approval the Ontario appellate case of *McIntosh v. Gzowski* (1979), 27 O.R.2d 151, 105 D.L.R.3d 721, 15 C.P.C. 14.   In *McIntosh,* 27 O.R.2d at 153–154, the court held that where two actions had been commenced against the tortfeasor, one by the board and the second by the injured worker

who had elected to receive benefits from the accident fund, only one action could be maintained at one time and the second action by the worker should be dismissed or stayed while the board's action was pending. Applying Canadian law, since the injured worker had elected to claim benefits from the accident fund in Ontario, only one action could be maintained, and that action had to be maintained by the board in the name of the injured worker.

The above authority begs the question as to what prejudice, if any, the trial court's action herein had upon the tortfeasor in permitting the action to be maintained by the injured worker and the board, and not solely the board in its representative capacity. We cannot divine, and defendant cannot demonstrate, any such prejudice. Had the trial court properly amended the caption of the case to reflect the board as the plaintiff in the name of McConnell, the trial could still have been conducted in the manner that it was with the same witnesses called to testify as to the same injuries and elements of the causes of action. The jury still could have concluded that the measure of damages in the verdict was in the amount it originally determined. Also, the caption of the case would have little effect on the verdict, other than form, because the damages would still be apportioned pursuant to Canadian law between the injured worker and the board, with the injured worker receiving the surplus of the damage award over and above the amount of benefits supplied by the board. Finally, the board was a party to the action and obviously acquiesced in the prosecution of the action by McConnell. In conclusion, any error with regard to who was the proper party to have commenced the action and how the caption of the complaint was to be composed, which merely highlights form over substance, was harmless.

The first assignment of error is overruled.

"II

■ "The trial court erred by allowing plaintiffs to introduce expert testimony in violation of Evidence Rule 702 and 703.[4] Plaintiffs' expert lacked the proper

---

4.  Evid.R. 702, Testimony by Experts, provides:

"A witness may testify as an expert if all of the following apply:

"(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2) The design of the procedure, test, or experiment reliably implements the theory;

qualifications, the facts upon which he based his opinion were unreliable, * * * and he had no personal knowledge of the facts of which he testified, and the facts were not otherwise admitted into evidence." (Footnote added.)

The expert testimony which forms the basis of this assignment is the testimony of the woodworking shop owner, Melvin Scheer. It is appellant's belief that Scheer was not qualified to be an expert pursuant to Evid.R. 702(B) due to a lack of background knowledge. It is also the appellant's belief that Scheer's opinion was not reliable pursuant to Evid.R. 702(C), and the opinion was not based on facts personally perceived by the expert pursuant to Evid.R. 703 in that the actual chair from the accident was not available for physical examination by the expert.

In addressing the issue of whether to allow a witness to testify as an expert witness, this court stated the following in *State v. Clark* (1995), 101 Ohio App.3d 389, 409–411, 655 N.E.2d 795, 807–809, discretionary appeal not allowed in (1995), 72 Ohio St.3d 1548, 650 N.E.2d 1367:

"It is well established that Ohio applies the 'relevancy standard' for the admission of expert testimony. *State v. Pierce* (1992), 64 Ohio St.3d 490, 495, 597 N.E.2d 107, 111; *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus. Under the relevancy standard, the admissibility of expert testimony is governed by Evid.R. 402, 403 and 702. *Id.* The test is whether the questioned evidence is relevant and will assist the trier of fact in understanding evidence presented or in determining a fact in issue. *Id.*

"* * *

"While Evid.R. 702 permits a witness to testify as an expert if his opinion or testimony will aid the trier of fact in search of the truth, a threshold determination must first be made in accordance with Evid.R. 104(A) concerning the qualification of the witness to testify as an expert. *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 528 N.E.2d 603.

"In determining the admissibility of an expert witness's testimony, the court must consider whether that witness will aid the trier of fact in search of the truth. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566–567; *State v. Gaines* (1992), 82 Ohio App.3d 467, 471, 612 N.E.2d 749, 750–751. In addition, a person may be qualified as an expert witness if the proponent of such witness can establish that the witness has

---

"(3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."

Evid.R. 703, Bases of Opinion Testimony by Experts, provides: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."

knowledge of scientific, technical or other such specialized nature. See Evid.R. 702; *Landskroner v. Pub. Util. Comm.* (1983), 5 Ohio St.3d 96, 5 OBR 176, 449 N.E.2d 760; and *State v. Buehler* (Jan. 29, 1987), Cuyahoga App. No. 51522, unreported, 1987 WL 4742. Such witness may be qualified as an expert based on special knowledge, skill, experience, training or education. Evid.R. 702.

"The determination of whether a witness possesses the qualifications necessary to allow his expert testimony lies within the sound discretion of the trial court. *State v. Wages* (1993), 87 Ohio App.3d 780, 786, 623 N.E.2d 193, 197; *State v. Williams* (1992), 80 Ohio App.3d 648, 655, 610 N.E.2d 545, 549. Such determination will not be reversed by an appellate court unless there is a clear showing of an abuse of discretion on the part of the trial court. *State v. Maupin* (1975), 42 Ohio St.2d 473, 71 O.O.2d 485, 330 N.E.2d 708; *State v. Minor* (1987) [(1988)], 47 Ohio App.3d 22, 546 N.E.2d 1343."

The trial court did not abuse its discretion by allowing Scheer to testify as an expert witness because his qualifications demonstrated he possessed knowledge, skill and experience that would assist the jury to determine issues relating to the claim of negligence and premises liability. Scheer, a long-time owner of a woodworking company in New York, testified that he had approximately thirty-six years of woodworking experience that included the design, repair, manufacture, and construction of wood furniture, including wood chairs used in commercial settings and chairs of the type involved in the accident herein. These qualifications gave Scheer knowledge of chair construction and mechanical failure therein superior to that possessed by the average juror. *Scott v. Yates* (1994), 71 Ohio St.3d 219, 221, 643 N.E.2d 105, 106–107; *State Auto. Mut. Ins. Co. v. Chrysler Corp.* (1973), 36 Ohio St.2d 151, 160, 65 O.O.2d 374, 379, 304 N.E.2d 891, 897; Evid.R. 104(A) and 702.

Finally, Scheer's opinion was based on a review of photographs of the chair in question that were shot on the morning after the accident. These photographs, which indicated that the left stretcher had been missing for some time and that some of the glued joints were loose (no matter what type of glue was used on the chair, animal or otherwise, some of the glued joints exhibited failure), since the dowel end pulled out of the joint rather than snapping when the chair collapsed, were admitted into evidence. The photographs having been admitted into evidence, the witness's opinion based on them was in accordance with Evid.R. 703.

The second assignment of error is overruled.

"III

"Where the plaintiff fails to prove that defendant had exclusive control at the time of the creation of the defect and also fails to prove that regular inspections

would have failed to detect any defect, the plaintiff has failed to prove the defendant has violated any duty of care and a *res ipsa loquitur* instruction is improper."

A recent case, *Caldwell v. Greek Corp.* (Sept. 19, 1997), Lucas App. No. L–96–397, unreported, 1997 WL 586708 (collapsed chair located on the outdoor patio area of a restaurant), discussed the application of the *res ipsa loquitur* evidentiary doctrine:

"The *res ipsa loquitur* doctrine is an evidentiary rule which permits, but does not require, an inference of negligence when the elements of the doctrine are shown. *Morgan v. Children's Hosp.* (1985), 18 Ohio St.3d 185 [18 OBR 253], 480 N.E.2d 464. To warrant the application of *res ipsa loquitur*, 'a plaintiff must adduce evidence in support of two conclusions: (1) That the instrumentality causing the injury was, at the time of the injury, or at the time of creation of the condition causing the injury, under the exclusive management and control of the defendant; and (2) that the injury occurred under such circumstances that in the ordinary course of events it would not have occurred if ordinary care had been observed.' *Hake v. Wiedemann Brewing Co.* (1970), 23 Ohio St.2d 65, 66–67 [52 O.O.2d 366, 367], 262 N.E.2d 703 [705].

"* * *

" 'Stated otherwise, the Ohio Supreme Court stated in *Loomis v. Toledo Railways & Light Co.* (1923), 107 Ohio St. 161, 169–170, 140 N.E. 639 [642]:

" 'The maxim *res ipsa loquitur* relates merely to negligence prima facie and is available without excluding all other possibilities, but it does not apply where there is direct evidence as to the cause, or where the facts are such that an inference that the accident was due to a cause other than defendant's negligence could be drawn as reasonably as that it was due to his negligence.'

" 'Where all the facts connected with the accident fail to point to the negligence of the defendant as the proximate cause of the injury, but show a state of affairs from which an inference could as reasonably be drawn that the accident was due to a cause or causes other than the negligent act of defendant, the plaintiff cannot rely upon mere proof of the surrounding facts and circumstances, nor is defendant called upon to explain the cause of the accident or purge itself of the inferential negligence. The doctrine of *res ipsa loquitur* does not apply in such case.' (Citations omitted.)" (Emphasis omitted.)

The record of the trial proceedings indicates that both parties addressed the use of *res ipsa loquitur* during their closing arguments. The trial court's instruction relative to the doctrine, which was not objected to by the defense at the time it was given, see Civ.R. 51, thereby waiving any error except in the case of plain error, provided the following:

"An invitee or business invitee. A visitor is a person who rightfully remains on the premises of another at the express or implied invitation. The owner of the premises has the duty to an invitee to use ordinary care for the invitee's or visitor's safety, to keep the premises in a reasonably safe condition and use ordinary care to provide notice of any concealed dangers of which the owner of the premises has knowledge or which by using ordinary care should have been discovered.

"Before you can find for the plaintiff. The plaintiff must prove by the greater weight of the evidence the injuries were proximately caused by an unsafe condition of the premises caused by the failure of the defendant or his agent to use ordinary care or, if the condition was not so created, that the condition was known to the defendant or his agent and the defendant or his agent failed to use ordinary care to correct it or to provide notice of the condition or, if such condition was not known to the defendant or its agents in using ordinary care, the defendant or its agents should have discovered the condition and used ordinary care either to correct it or to give notice of the condition.

"Where an instrument which caused the injury is in the *exclusive control of the defendant and the event which is one that would not have happened, if ordinary care was used,* **you may but you are not required to infer** *from these circumstances* **the defendants were negligent. Such inference, if made, is sufficient for a finding of negligence.** *However, the defendant may equal or overcome such inference by evidence tending to show ordinary care was used.* The weight of the inference of the defendants' negligence as well as the weight of the explanation offered to meet that inference are for you to determine, infer or to make an inference as to reach a reasonable conclusion of fact from other facts that you have found have been established by direct evidence. * * *" (Italicization and emphasis added.)

In the case at bar, appellants argue in this assignment that the instruction on the doctrine was improper under the circumstances because plaintiff allegedly presented no facts demonstrating that (1) the chair was under the exclusive control of the defendants, or (2) the accident would not have occurred if ordinary care had been observed by defendants.

We conclude that at the time of the injury, the chair was not under the exclusive control of the defendants, but was, instead, under the control of McConnell at the time, who had rented the private room for the evening and had used his discretion in determining who would use the chair and when it would be used during his stay at the motel. This public access to the instrument of the injury precludes a finding of exclusive control on the part of the motel. See *Caldwell v. Greek Corp., supra; Cochran v. Ohio Auto Club* (Oct. 3, 1996), Marion App. No. 9–96–33, unreported, 1996 WL 562055 (collapsed chair located in the

office of an auto club); *Defelice v. Imperativo, Inc.* (Oct. 6, 1994), Cuyahoga App. No. 66672, unreported, 1994 WL 547725 (collapsed chair located on public sidewalk in an eating area outside of restaurant); *Brown v. Univ. Hosp. of Cleveland* (June 7, 1990), Cuyahoga App. No. 57101, unreported, 1990 WL 75203 (collapsed chair located in hospital waiting room); *Hale v. Stein* (June 21, 1978), Hamilton App. No. C–77287, unreported (collapsed chair located in a restaurant). Absent the element of exclusive control of the instrument at the time of the accident by the defendants, the doctrine of *res ipsa loquitur* does not apply.

In addressing the narrow application of "plain error" in the context of a civil case, the Ohio Supreme Court stated the following in *Goldfuss v. Davidson* (1997), 79 Ohio St.3d 116, 679 N.E.2d 1099, syllabus:

"In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself."

The effect of considering *res ipsa loquitur* improperly obviated the burden of proof in the negligence cause of action, thereby seriously affecting the basic fairness of the judicial process. Under a plain error analysis, it cannot be said with assurance that but for the error of including an instruction on *res ipsa loquitur* the outcome of the trial would be the same.

The third assignment of error is found to have merit.

"IV

"Where the plaintiff fails to prove that the defendant through the exercise of ordinary care could have detected a defect, the defendant is entitled to a directed verdict."

By virtue of the determination on the previous assignment of error, this assignment is moot and need not be addressed. See App.R. 12(A)(1)(c).

*Judgment reversed*
*and cause remanded for a new trial.*

PATRICIA A. BLACKMON, A.J., and PATTON, J., concur.